In the Matter of the Real Estate Salesperson's License of Robert E. HAUGEN, Plaintiff.

In the Matter of the Real Estate Brokers' Licenses of STERLING INVESTMENT, INC., and Mel B. Gullickson, petitioners, Respondents,

v.

STATE of Minnesota, DEPARTMENT OF COMMERCE, SECURITIES DIVISION, Appellant.

No. 48750.

Supreme Court of Minnesota.

March 30, 1979.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Thomas R. Muck, Asst. Atty. Gen., Robert C. Carlson, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Robert A. Hillstrom and Bradley J. Martinson, G. Stanley Rischard, Minneapolis, for respondents.

Heard before ROGOSHESKE, PETERSON, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

The Securities Division of the Minnesota Commerce Department (state) appeals from an order and judgment of the Hennepin County District Court which reversed a decision of the Minnesota Commissioner of Securities (commissioner) to suspend the real estate broker's license of Sterling Investment, Inc. (Sterling) and revoke the real estate broker's license of Melvin P. Gullickson, Sterling's president. We affirm.

Sterling, a Minnesota corporation, is licensed as a corporate real estate broker by the State of Minnesota. Gullickson is licensed as an individual real estate broker to act for Sterling, and is an authorized signatory on Sterling's trust account with Golden Valley State Bank. The charges against Sterling and Gullickson arise out of their

attempts to find a buyer for the River House Supper Club (River House) in Brooklyn Park, Minnesota.

On December 29, 1975, Sterling entered into a listing agreement with Stanley and Joan Schwartz, the owners of the River House. On March 22, 1976, Nicholas F. MacKondy contacted Sterling in response to a newspaper advertisement in which Sterling advertised the sale of severai supper clubs in and around the Twin Cities. At that time, Sterling gave MacKondy a listing sheet describing the River House and an unaudited financial statement of the supper club's operations from April 1, 1975, to December 31, 1975. The listing sheet specified that the River House had gross sales of approximately $310,000 in 1975.

Following his initial contact with Sterling, MacKondy personally inspected the River House and had his accountants prepare financial projections, using the information he received from Sterling. On April 15, 1976, MacKondy signed a formal offer to purchase the River House and gave Sterling a $10,000 check as earnest money. This initial offer was rejected by the Schwartzes and MacKondy's $10,000 check was returned. After further negotiations, Stanley Schwartz and MacKondy eventually entered into a purchase agreement on May 13, 1976. Pursuant to the terms of that agreement, MacKondy gave Sterling a $5,000 check as earnest money [1] and this was deposited in Sterling's trust account.

Subsequent to execution of the purchase agreement, MacKondy began to question the accuracy of the financial information supplied to him by Schwartz through Sterling. At a May 20, 1976, meeting, Schwartz informed MacKondy of changes in the River House's operating expenses which improved its financial status. MacKondy remained skeptical of the financial information and requested that Sterling procure certified or audited financial statements and a copy of the River House's 1975 tax return. Sterling was unable to comply with this request because Schwartz would not supply the necessary information.

From May 25, 1976, through June 2, 1976, MacKondy and his wife spent much time at the River House observing its sales and operations. MacKondy continued to question the accuracy of the financial information and, on June 2, 1976, informed his attorney that he was considering "backing out" of the purchase. On June 3, 1976, MacKondy and his attorney again attempted, without success, to obtain audited financial statements or a copy of the River House's 1975 tax return. Finally, on June 4, 1976, as a result of his inability to verify the claimed financial status of the supper club, MacKondy decided not to go through with the purchase. Accordingly, on that same date, he cancelled his liquor license, loan, and insurance applications.

Immediately after MacKondy withdrew his liquor license application, the City of Brooklyn Park called the Schwartzes and informed them of the license cancellation. The Schwartzes in turn called Sterling and arranged a meeting for the evening of June 4, 1976, between themselves, the MacKondys and Sterling. At this meeting, in an attempt to convince the MacKondys to change their minds about backing out of the purchase, Stanley Schwartz disclosed that he "skimmed" $2,800 monthly from the River House receipts and that consequently this money did not appear on its books. In a further attempt to salvage the sale, Schwartz called MacKondy on June 5, 1976, and disclosed an additional $500 of unreported income each month. On June 6 and 7 the MacKondys continued to talk with both the Schwartzes and Sterling personnel. In the evening of June 7, 1976, MacKondy telephoned the Sterling office and reaffirmed his decision of June 4 not to complete the purchase.

MacKondy's attorney called Gullickson on June 8, 1976, and informed him that Schwartz and MacKondy were "going to effect a cancellation" of the purchase agreement, and requested a return of the earnest money. Gullickson immediately

---

1. The earnest money was reduced from $10,000 to $5,000 on MacKondy's request after he was

informed that he would forfeit his earnest money if he defaulted on the purchase agreement.

called his own attorney and requested instructions on what to do with the earnest money. Sterling's attorney concluded that MacKondy had defaulted on the purchase agreement and advised Gullickson to remove the money from the trust account and disburse it to his salespersons. On June 10, 1976, pursuant to his attorney's advice, Gullickson withdrew the $5,000 from Sterling's trust account and deposited it in Sterling's business account.

On June 18, 1976, MacKondy paid Schwartz $2,000, and the parties executed a cancellation of the purchase agreement which specifically provided that MacKondy was "not in default." A copy of this agreement was forwarded to Gullickson. Thereafter, MacKondy commenced an action in Hennepin County District Court for the return of his earnest money,[2] and made complaint to the securities division. Charges were brought against Sterling, Gullickson, and various brokers and salespersons associated with Sterling. The complaint charged, *inter alia,* that Sterling and Gullickson violated Minn.St. 82.24[3] and Minn.Reg.S.Div. 1505(3)[4] by making an impermissible disbursement from a trust fund. On April 14, 1977, following a hearing on February 23, 1977, the hearing examiner filed her findings and conclusions, and recommended that Sterling and Gullickson be disciplined for the trust fund violations.

Pursuant to Minn.St. 15.0421, an attorney representing Sterling and Gullickson sent a letter to the commissioner requesting that he be given the opportunity to present "oral and/or argument" to the majority of the officials who would render a final decision affecting his clients. Without responding to this letter, the commissioner issued his findings, conclusions, and order on June 15,

1977. He concluded that Sterling and Gullickson committed a trust fund violation and ordered that Sterling's license be suspended for 7 days and that Gullickson's be *revoked.*

Pursuant to Minn.St. 15.0424, this action was appealed to the Hennepin County District Court. On December 21, 1977, the district court filed an order vacating and voiding the commissioner's order. Judgment was so entered on January 6, 1978. On February 3, 1978, the commissioner appealed from that judgment to this court pursuant to Minn.St. 15.0426.

■ The hearing examiner, as well as the commissioner, found that Gullickson and Sterling violated the trust fund standards of Minn.St. 82.24, subd. 1, and Minn.Reg.S. Div. 1505(3). The district court concluded that this determination was erroneous. On appeal to this court, however, we recognize:

"* * * that it is our function to make an independent examination of an administrative agency's record and decision and arrive at our own conclusions as to the propriety of that determination without according any special deference to the same review conducted by the trial court." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977).

Minn.Reg.S.Div. 1505(3) provides that disbursement of funds from a trust account can only be made in accordance with the terms of the applicable agreements (see fn. 4, *supra* ). Here, the purchase agreement reads, in relevant part, as follows:

"If the buyer under this contract shall default in any of the agreements and continue in default for a period of five days, then and in that case seller may terminate this agreement and upon said

2. Sterling subsequently offered to return the $5,000, but MacKondy demanded an additional $2,000 to compensate him for the money he paid Schwartz.

3. Minn.St. 82.24, subd. 1, reads as follows: "All trust funds received by a broker or his salespersons shall be deposited forthwith upon receipt in a trust account, maintained by the broker for such purpose in a bank designated by the broker, except as such moneys may be

paid to one of the parties pursuant to express written agreement between the parties to a transaction. * * * "

4. Minn.Reg.S.Div. 1505(3) provides as follows: "Said trust funds shall be maintained in the trust account until disbursement is made in accordance with the terms of the applicable agreements and proper accounting is made to the parties entitled thereto."

termination, all payments made upon this contract shall be retained by the agent of the seller. Earnest money first to apply to commission due as per listing agreement on said property, the balance thereof to be paid to seller  *  *  *."

In finding that Gullickson and Sterling did not disburse the trust funds in accordance with the terms of the purchase agreement, the hearing examiner reasoned as follows:

"Since, under the purchase agreement termination by the seller is a condition precedent to retention of the earnest money by the agent of the seller, this Examiner finds it unnecessary to reach the question of whether MacKondy was in default as of June 10, 1976. There was no evidence introduced by either the Securities Division or the Respondents which indicated that the seller terminated the contract. Therefore, Sterling could not legally have disbursed the earnest money even if a default had occurred."

The commissioner articulates no reasons of his own as to why Gullickson and Sterling were in violation of Minn.Reg.S.Div. 1505(3), and thus we must assume that he adopts the above reasoning of the hearing examiner. As recognized by the district court, this reasoning is oversimplistic.[5] The hearing examiner was apparently so concerned that there was no formal written termination of the purchase agreement that she failed to see the realities of the matter before her.

■ The purchase agreement does not require that the termination be in writing. Here we have no difficulty in concluding that it had been orally terminated prior to the disbursement on June 10, 1976. Gul-

lickson testified that on June 8, 1976, MacKondy's attorney called Gullickson and told him that "they were going to effect a cancellation between the buyer and seller." It was reasonable for Gullickson to assume, at that time, that the purchase agreement was terminated and that only the details of the termination remained to be negotiated. Further, it is clear from the record that the other prerequisites for disbursal of the trust funds were present. By cancelling his liquor license, loan, and insurance applications on June 4, 1976, of which Schwartz was aware, MacKondy anticipatorily breached the purchase agreement,[6] thereby placing himself in default. Gullickson did not disburse the trust funds until June 10, 1976, and thus MacKondy had remained in default for over five days. Accordingly, we find that the earnest money was distributed in accordance with the terms of the purchase agreement, and conclude that neither Minn.St. 82.24 nor Minn.Reg.S.Div. 1505(3) was violated. Thus, we affirm the district court's order vacating the commissioner's determination.

■ Although we need not reach the other issues raised by the briefs, we also wish to note our concern for the lack of basic fairness exhibited in the agency's decision-making process in this case. As mentioned previously, the commissioner issued his final decision without responding to Gullickson's request for argument. By statute, any person adversely affected by the hearing examiner's report is given the right to file exceptions to it and present argument to a majority of the officials who will make the

---

5. The district court was concerned with the simplicity of the hearing examiner's reasoning. In its memo the court stated: "The oversimplicity of the Hearing Officer's determination leaves questions that ought to have been considered. Are there not three interested parties to the purchase agreement? Are the vendor and vendee in a position privately to bargain without regard to the broker who brought them together? Was there not a contract that was voidable rather than void? Then until terminated, did not the facts as Gullickson knew them constitute a default? If there was a de-

fault can the vendor and vendee deprive the broker of rights he had by now putting into writing for a sum paid the vendor that no default exists? These are factors to be determined in the pending trial."

6. It is basic hornbook law that an unconditional repudiation of a contract, either by words or acts, which is communicated to the other party prior to the time fixed by the contract for his performance constitutes an anticipatory breach. 4 Corbin, Contracts, § 959; 11 Williston, Contracts, 3 ed., § 1301.

ultimate determination. Minn.St. 15.0421.[7] The state, in its brief, argues that the commissioner was under no statutory obligation to respond to Gullickson's request for argument but could instead assume that Gullickson would submit a written argument without further direction from his office.[8] At oral argument, however, the state's counsel conceded that the commissioner's action cannot be justified. Counsel candidly informed this court that:

> "I'm not defending, not responding. Somehow the letter fell between the cracks. It was certainly not an intentional thing not to respond but it just sat on someone's desk or got in a file or something and we didn't, and I offer no defense for it, it just happened."

As recognized by the state's attorney, there seems little question that the procedure followed by the commissioner was improper. Section 15.0421 requires that respondents be afforded an "opportunity" to present argument (see, n. 7, *supra*). In order for this to be a meaningful opportunity, the commissioner should have responded to respondents' letter and established a proper form, time and place for argument. Even

apart from the statute, basic concepts of fair play so require. See, *Morgan v. United States,* 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938).[9]

Finally, we must also express our concern over the inappropriateness of the sanctions imposed on Sterling and Gullickson.[10] The penalties here seem completely uncalled for, based upon the evidence. The record shows that other than depositing the earnest money in Sterling's trust account, Gullickson had no personal involvement with the sale of the River House prior to June 8, 1978. He was not personally a party to the complicated negotiations and disclosures leading up to MacKondy's backing out of the purchase. Prior to disbursing the trust funds he sought the advice of his attorney. He testified that he fully intended to return MacKondy's earnest money if his attorney told him to do so. He only disbursed the money after being told by his attorney that he had earned it as his commission and could permissibly transfer it from the trust account. The hearing examiner specifically noted that Gullickson transferred the trust funds " * * * in good faith based upon his [sic] cancellation

---

**7.** The statute provides in full as follows: "In all contested cases the decision of the officials of the agency who are to render the final decision shall not be made until the report of the hearing examiner as required by section 15.052, has been made available to parties to the proceeding for at least ten days and an opportunity has been afforded to each party adversely affected to file exceptions and present argument to a majority of the officials who are to render the decision."

**8.** The district court noted that the average lawyer seldom appears before bodies such as the securities commission, and that some direction from that body " * * * may be desirable in the public interest."

**9.** In *Morgan,* the United States Supreme Court stated: "The maintenance of proper standards on the part of administrative agencies in the performance of their quasijudicial functions is of the highest importance and in no way cripples or embarrasses the exercise of their appropriate authority. On the contrary, it is in their manifest interest. For, as we said at the outset, if these multiplying agencies deemed to be necessary in our complex society are to serve the purposes for which they are created and endowed with the vast powers, they must ac-

credit themselves by acting in accordance with the cherished judicial tradition embodying the basic concepts of fair play." 304 U.S. 22, 58 S.Ct. 778, 82 L.Ed. 1134.

**10.** Although there are no Minnesota cases directly on point, we recognize that the assessment of penalties and sanctions by an administrative agency is not a factual finding but the exercise of a discretionary grant of power. See, e. g., *Beall Construction Company v. Occupational Safety and Health Review Commission,* 507 F.2d 1041, 1046 (8 Cir. 1974); *Tempo Trucking and Transfer Corp. v. Dickson,* 405 F.Supp. 506, 514 (E.D.N.Y.1975). But of course the agency's discretion in imposing sanctions is not unfettered. *Kostika v. Cuomo,* 41 N.Y.2d 673, 394 N.Y.S.2d 862, 363 N.E.2d 568 (1977). And if that discretion is abused, we will set the sanction aside on appeal. See, e. g., *Szmaciarz v. California State Personnel Board,* 79 Cal.App.3d 904, 145 Cal.Rptr. 396 (1978); *Cooper v. Board of Medical Examiners,* 49 Cal.App.3d 931, 123 Cal.Rptr. 563 (1975); *Nino v. Yonkers City School District,* 43 N.Y.2d 865, 403 N.Y.S.2d 460, 374 N.E.2d 359 (1978); *Kostika v. Cuomo, supra.*

with Sterling's attorney * * *." After hearing all of the testimony and viewing the exhibits, she found that his actions " * * * were, at best, precipitous." Upon this evidence Gullickson's license was revoked. Imposition of such a drastic sanction, on the basis of this record, amounts to a clear abuse of discretion.

Based upon all the evidence, we must agree with the trial court that the commissioner of securities should be reversed and that the order of the commissioner be in all respects declared vacated and void.

Affirmed in all respects.

TODD, J., took no part in the consideration or decision of this case.