**In the Matter of DETERMINING the
NATURAL ORDINARY HIGH
WATER LEVEL OF LAKE PULASKI.**

No. C4–85–2143.

Court of Appeals of Minnesota.

April 1, 1986.

William J. Keppel, Gregory A. Fontaine, Dorsey & Whitney, Minneapolis, for relator, Save Lake Pulaski Association, Inc.

Hubert H. Humphrey, III, Atty. Gen., A.W. Clapp, III, Beverly Conerton, Spec. Asst. Attys. Gen., St. Paul, for Dept. of Natural Resources.

Heard, considered, and decided by CRIPPEN, P.J., and WOZNIAK and SEDGWICK, JJ.

## OPINION

WOZNIAK, Judge.

The Association appeals from an order determining the ordinary high water level

of Lake Pulaski in Wright County. It contends the Commissioner of Natural Resources erred by not granting oral argument, by selecting an ordinary high water level not advocated by either party to the proceeding, by incorrectly applying Minn. Stat. § 105.37, subd. 16, and by unconstitutionally taking private property. It also contends the Commissioner's decision is unsupported by substantial evidence and is arbitrary and capricious. We affirm.

## FACTS

Lake Pulaski[1] is approximately two miles long and one mile wide. It is landlocked with neither a natural nor an artificial outlet. The shoreline is almost completely developed. More than 240 homes and summer cottages surround it. The first structure dates to before 1853. The natural features around most of the lake have been obscured or destroyed by grading, filling and landscaping. The dividing line between Little Lake Pulaski and Lake Pulaski has been substantially modified with filling and dredging.

In 1964, the Department of Natural Resources (DNR) surveyed the lake in order to determine whether certain filling was below the ordinary high water level. The survey crew chief set the ordinary high water level at 960.5 feet. While there was no intention to formally establish the ordinary high water level of the lake and no contested case hearing, the DNR, Wright County, and the City of Buffalo used the 960.5 foot elevation as a basis for regulation.

In 1981, the DNR commenced a formal proceeding to establish the ordinary high water level after it received a number of citizen complaints and permit applications. After a hearing, the Commissioner issued an order establishing the ordinary high water level at 968.8 feet. The order was not appealed.

In response to numerous complaints, the DNR decided to have a new determination made based upon a new record. Hearings began in March 1985. The Association advocated an ordinary high water level of 961.4 feet. The DNR advocated a 968.8 foot level.

Recordings of water levels on Lake Pulaski began in 1941. Between 1941 and 1946, lake levels varied between 951.7 feet and 955.4 feet. Sporadic readings between 1947 and 1981 show a low of 958.7 feet and a high of 962.5 feet. Since 1981 the level of the lake has varied between a low of 960.9 feet and a high of 965.6 feet. The elevation recorded on the first day of the hearing, 965.63 feet, is the highest recorded elevation on the record.

The DNR relies on a variety of evidence to determine ordinary high water levels. It relies on tree elevations because of a tree's relative permanence. If a tree is inundated with water for approximately one to three years, it will die. Generally, a hardwood tree requires unsaturated soil at least equal in depth to its diameter in order to survive. A softwood tree requires unsaturated soil at least equal to one-half of its diameter. The DNR estimates the ordinary high water level by measuring the ground elevation at the base of selected trees, subtracting the diameter, and averaging the reduced elevations.

The reliability of an ordinary high water level estimate based on tree elevations depends upon the trees selected for study. In 1981 the DNR selected 16 trees which were in an undisturbed area atop a geological feature referred to as an "old lake bank." This site was selected after the DNR determined that it was the outer limit for where the ordinary high water level must be located. The average reduced elevation for the 16 trees was 968.8 feet.

In 1985, the DNR took borings from 12 trees. Six of those bored were located on top of the feature known as the old lake

---

1. Lake Pulaski was named after Brigadier General Count Casimir Pulaski, a Polish patriot, enemy of kings, and George Washington's most skilled cavalry commander. He was killed in 1779, at age 32, in Savannah, Georgia. He is named and recognized as the Father of the American Cavalry.

bank. Five of the six were more than 100 years old with an average age of 111 years. The sixth tree could not be dated. With the exception of the Leonard elm, these trees are the only ones which are more than 100 years old. The reduced elevations ranged from 969.55 feet to 970.17 feet. The other six trees the DNR selected were the largest which could be found below the old lake bank elevation. These trees were 56 years or younger with an average age of 47 years.

Seven trees selected by the Association were bored after the hearing concluded because the Association presented evidence based upon estimates of their age. An independent examiner appointed by the administrative law judge determined that, with two exceptions, the ages ranged from 43 to 60 years.

The two exceptions are the How oak and the Carpenter-Poirier cottonwood. The oak is 74 years old. The cottonwood is over 69 years old. Both are located on Little Lake Pulaski. The oak has a reduced elevation of 964.56 feet and the cottonwood has a reduced elevation of 963.3 feet. According to a 1959 memorandum in DNR files, correspondence dating back to 1927 indicates the isthmus separating Little Lake Pulaski and Lake Pulaski has been opened and closed several times by various parties. A 1928 letter from a district court judge indicates that the outlet from Lake Pulaski into Little Lake Pulaski had been opened twice "this spring" and that the judge himself had closed it in June of 1928. DNR files also indicate that a 1927 inspection revealed a channel between the lakes and that the channel had been deepened at some time earlier.

A 139-year-old elm grew on the northern shore of Lake Pulaski until it died in 1982. Its reduced elevation is 965.67 feet. A cabin with a ground elevation of 969.5 feet stands between the lake and the tree and has stood between the two since 1926. There has been some modification of the area by landscaping. In order for water from the lake to reach the elm, the water would have to rise to at least 969.5 feet.

There is no substantiated evidence that the lake has ever reached 969.5 feet.

The geologic feature known as the old lake bank was formed by ice pushing against the shore. There is a dispute about when it was formed. Hundreds of exposed boulders protrude from the lakeward side of the feature. The top elevation of the exposed boulders is roughly 970.1 feet.

Indicia of old lake banks include a wall around a tree with a base elevation of 968.7 feet. The wall was placed around the tree to keep it from falling when a lake bank was leveled in the mid-1940's. The bank was described as a narrow sandy strip which was so steep a model-T could not be driven up it. A long-time resident recalled that the water "came up pretty close to the tree" in the early 1920's.

Aerial photographs were taken of the Lake Pulaski area in 1937. Using a stereoscope to obtain a three dimensional view, eight separate shorelines can be discerned. The highest water mark was located below the hardwood tree line. Development was generally above the line. A hydrologist with 28 years of experience in reading and interpreting aerial photographs placed the highest water mark approximately 20 feet from a portion of the road east of an S-curve. There is no indication of vegetation in the area between this portion of the road and the lake. The elevations of the road portion vary between 971.6 feet and 973.4 feet. The hydrologist estimated that the elevation 20 feet from the center line of the road is 968 feet.

An old-timer recalled throwing peanut shells into the lake from a wagon while the wagon was on the road at the S-curve. He and his brother threw the shells into the water in the early 1920's. He believes that the lake was approximately three feet higher at that time than it was in 1985 (approximately 968.6 feet).

A long-time resident recalled that in the early 1920's "water came up through" a long rock wall on the eastern shore of the lake. The average elevation of the bottom of the wall is 966.1 feet.

Based on an 1893 plat of Pulaski beach subdivision, the lake must have been at an elevation of 960 feet at that time. A house built in the area between 1911 and 1913 has footings at elevations between 966.9 feet and 966.6 feet. A woman who has been swimming in the lake since 1926 had "never seen the lake this high." Citizens who had observed the lake since 1935 have never seen it as high as it is at this time.

Of the 48 structures thought to have been built between 1900 and 1930, only five are presently located below an elevation of 969.0 feet. Three of these five were built in 1930 when the lake levels were thought to have been dropping and the other two were allegedly moved closer to the lake when the levels had dropped. Of the 84 structures thought to have been built between 1931 and 1970, 52 are located below 969.0 feet.

After a five-day hearing, the administrative law judge issued a report recommending that Lake Pulaski's ordinary high water level be set at 967.5 feet. He noted that the most important facts leading to the recommendation were the tree elevations, the aerial photographs, and the recollections from the early 1920's which supported the elevations indicated by the photographs.

The administrative law judge found that the only trees which were proven to be more than 100 years old had reduced elevations between 969.55 and 970.17 feet. Those trees with unquestioned locations were from 31 years old to more than 60 years old and too young to be relied upon.

The administrative law judge found that the road is a reliable landmark and its elevation may be used along with other evidence to determine past lake levels. He concluded that, while no great accuracy could be placed on an old-timer's recollections of tossing peanut shells into the lake, the recollections supported the elevations derived from the aerial photographs.

The administrative law judge found that it would be imprudent to rely upon either the How oak or the Carpenter-Poirier cottonwood as reliable indicators of water levels on Lake Pulaski because they were located on Little Lake Pulaski and there had been numerous openings and closings of the channel. He also stated that he had a reasonable degree of confidence that, if the lake ever rose to an elevation of 968.8 feet, the rise must have taken place before 1926 and that the existence of the 139-year-old elm cast some doubt on the DNR's ordinary high water level estimate of 968.8 feet.

The administrative law judge also found that the exposed boulders at the geologic feature were exposed by the action of water from Lake Pulaski, but there is no reliable way to know when the lake washed them; thus, they alone are no direct help in establishing the ordinary high water level. He also found that none of the other old lake banks gave a reliable basis for determining the ordinary high water level.

The administrative law judge further found that old postcards could be used to estimate lake levels in 1900 and 1908 at 961.0 feet and the elevation in 1914 and 1915 at approximately 961 to 963 feet. He concluded that, while the difference in elevation of the houses built before 1930 and those built after 1930 might show some correlation between when people built and the elevation at which they built, exceptions and other explanations are such that not much weight could be attributed to house placement.

The administrative law judge finally concluded that neither the DNR nor the Association sustained its burden of proving its proposed ordinary high water level. He recommended that the Commissioner establish the ordinary high water level at 967.5 feet.

The DNR and the Association filed exceptions to the administrative law judge's findings. The Commissioner adopted the administrative law judge's report in the main and his recommendation to set the ordinary high water level at 967.5 feet. The Association appeals from the order setting the ordinary high water level.

## ISSUES

1. Did the Commissioner commit reversible error by not granting oral argument?

2. Did the Commissioner err by selecting an ordinary high water level not advocated by either party to the proceeding?

3. Did the Commissioner incorrectly apply Minn.Stat. § 105.37, subd. 16 by considering evidence dating over a 150-year span?

4. Did the Commissioner incorrectly apply Minn.Stat. § 105.37, subd. 16 by not relying upon the point where the vegetation changes from terrestrial to aquatic?

5. Does substantial evidence support an ordinary high water level of 967.5 feet?

6. Has there been an unconstitutional taking?

## ANALYSIS

1. On September 6, 1985, the Association filed its written exceptions and arguments to the administrative law judge's report along with a letter stating:

[p]ursuant to Minn.Stat. § 14.61, we request the opportunity to meet with you to provide additional information and to answer any questions which you may have.

The Commissioner issued his order without responding to the request. The Association now contends that the Commissioner's order must be vacated because he failed to provide it with an opportunity to give additional information and present oral argument.

▪ We find no error. All evidence to be considered must be in the record maintained by the administrative law judge. *See* Minn.R. 1400.7400, subp. 1 (1983). Factual information or evidence which is not part of the record may not be considered by either the administrative law judge or the agency when making its decision. Minn.R. 1400.8100, subp. 1 (1983). Thus, a request to provide additional information was inappropriate and the Commissioner was not obligated to respond to it. The Association's offer to answer questions that the Commissioner might have is not tantamount to a request for oral argu-

ment as suggested by the Association. Therefore, the Commissioner did not err by failing to respond to the Association's letter before rendering his final decision. However, we wish to make it clear that the Commissioner's contention that Minn.Stat. § 14.61 does not require oral argument is neither supported by the words of the statute nor case law. *See In re Haugen,* 278 N.W.2d 75, 79–80 (Minn.1979); *Yellowbird, Inc. v. MSP Express, Inc.,* 377 N.W.2d 490, 494 (Minn.Ct.App.1985). Had the Association requested oral argument, it should have been granted.

2. The Association contends that the administrative law judge erred by selecting an ordinary high water level after concluding that the DNR did not meet its burden of proving the ordinary high water level of 968.8 feet which it advocated. Specifically, the Association contends that the administrative law judge should have ruled against the DNR and either dismissed the matter, accepted the Association's recommendation, or required further proceedings. It reasons that the burden of proof in setting the ordinary high water level is akin to the burden with respect to liability in a tort case. The burden is either satisfied, in which case the plaintiff is entitled to compensation, or it is not and the case should be dismissed.

▪ In a contested case:

[t]he party proposing that certain action be taken must prove the facts at issue by a preponderance of the evidence * * *.

Minn.R. 1400.7300, subp. 5 (1983). Both the DNR and the Association proposed that an ordinary high water level be set for Lake Pulaski. The DNR specifically advocated a level of 968.8 feet and the Association advocated a level of 961.4 feet. We find no error because the precise levels advocated were not recommended by the administrative law judge and adopted by the Commissioner.

▪ The ordinary high water level is:

the boundary of public waters and wetlands, and shall be an elevation delineating the highest water level which has

been maintained for a sufficient period of time to leave evidence upon the landscape, commonly that point where the natural vegetation changes from predominantly aquatic to predominantly terrestrial.

Minn.Stat. § 105.37, subd. 16 (1984). It is the boundary of public waters and must be stated in terms of elevation. *Id.; Schalow v. Mason*, 357 N.W.2d 150, 152 (Minn.Ct. App.1984). However, while the elevation required is precise, the statute defining the ordinary high water level recognizes that nature does not provide the evidence to set it with precision. *See Lindberg v. Dept. of Natural Resources*, 381 N.W.2d 494 (Minn. Ct.App.1986). Thus, any determination is imperfect.

■ An ordinary high water level determination is unlike the issue of whether there is liability in a tort case. Each lake has an ordinary high water level set by nature. The question is, where is it? The question may only be answered in a fact-finding process. Where the DNR or other advocate fails to sustain the burden of proving a specific elevation in a contested case, the administrative law judge may then determine whether the evidence sustains the setting of the ordinary high water level or whether the case must be dismissed. If the Commissioner concludes that the ordinary high water level recommended by the administrative law judge is supported by a preponderance of the evidence, he may adopt the ordinary high water level recommended.

3. The Association contends that the Commissioner incorrectly applied Minn. Stat. § 105.37, subd. 16 by considering evidence dating over a 150-year span. It argues that (1) under the statute, the ordinary high water level is a line, existing at the time the ordinary high water level determination is made, above which there is no significant aquatic vegetation and below which there is no significant terrestrial vegetation; (2) the statute requires only the minimum time necessary for water to leave evidence of aquatic or terrestrial vegetation on the landscape; and (3) the statu-

tory time period is relatively short—only the period necessary to change the character of the vegetation, typically one to three years.

■ The Association misconstrues the statute.

The statutory definition of ordinary high water level applies to both public waters and to wetlands and for each the recoverable evidence may be different. However, in either case the ordinary high water level *"shall be* an elevation delineating the *highest* water level which has been maintained for a sufficient period of time to leave evidence upon the landscape." *Id.* (Emphasis added.) Any evidence left by the water must be considered when determining the ordinary high water level.

*Lindberg*, 381 N.W.2d at 496. The Association would have us believe that the Commissioner has adopted a 150-year standard to be used in determining the ordinary high water level for every lake. Such is not the case. The Commissioner accepted the 150-year time frame used by the administrative law judge in this case "because there are reliable data available within that time." Thus, the standard applied was not one of 150 years, but rather a time in which reliable evidence was available. The Commissioner did not err in adopting the latter standard.

If the Association's reasoning was adopted, the ordinary high water level would be determined solely by the choice of year in which to make the determination. If the determination of the ordinary high water level were made during the 1930's, it would be radically different from one made today or perhaps even from one made three years from today. If an ordinary high water level determination could be governed solely by the choice of time in which to make it, the Commissioner would have authority not contemplated by the legislature. Any determination made solely on the basis of the time chosen would be contrary to both public and private interests.

4. The Association contends that the Commissioner erred by relying on current

water levels to establish Lake Pulaski's ordinary high water levels. We find no such reliance.

■ The administrative law judge specifically stated that "the most important facts leading to the recommendation" were the elevations of the five trees which were proven to be more than 100 years old, elevations derived from the aerial photographs of 1937 and 1940, and the recollections supporting those elevations. The Commissioner adopted the administrative law judge's recommendation. In his memorandum, the Commissioner stated:

> During any particular year, it is easy to make precise water level measurements, but without a reliable historical basis, those measurements are simply one-time observations and have a very limited utility for accurately predicting a lake's water level range over a period of years. The only way to avoid being fooled by nature is by collecting the greatest number of reliable measurements over the longest period of time possible before coming to a conclusion.

The Commissioner specifically stated that it relied on the 1937 and 1940 aerial photographs, the testimony interpreting them, witnesses' recollections of lake levels in the early 1920's, and the elevations of the trees more than 100 years old.

5. The Association also contends that the Commissioner's determination is not supported by substantial evidence. Substantial evidence is:

(1) Such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;

(2) More than a scintilla of evidence;

(3) More than some evidence;

(4) More than any evidence; and

(5) Evidence considered in its entirety.

*Cable Communications Board v. Norwest Cable Communications Partnership,* 356 N.W.2d 658, 668 (Minn.1984).

The Association argues that the 1937 and 1940 aerial photographs do not support the Commissioner's determination. It concentrates on the finding that there was an absence of vegetation in the area between the road and the lake and argues that the Commissioner was wrong in concluding that there was no significant vegetation below the 967 to 971 foot level. The Association mischaracterizes the findings related to the aerial photographs. The Commissioner found that the photographs indicate eight separate shorelines in two separate locations and the road could be used to gauge the elevations of the highest one at between 967 and 971 feet. He further found that it was located below the hardwood tree line. The Association's assertion that 60-year-old trees were standing below the 967 foot level is consistent with the Commissioner's finding.

The Association contends that the vegetation evidence proves that the proper ordinary high water level is 961.4 feet. In essence, the Association is rearguing its contention that the Commissioner erred by looking at evidence spanning a 150-year period. It now argues that the Commissioner should eliminate the evidence provided by the trees over 100 years old and rely on younger trees and the How oak, the Carpenter-Poirier cottonwood and the Leonard elm.

■ The trier of fact, not this court, determines the weight to be given to testimony and the inferences to be drawn therefrom. *Gibson v. Civil Service Board,* 285 Minn. 123, 126, 171 N.W.2d 712, 715 (1969). Substantial evidence supports the findings in this case and the findings support the conclusion that the ordinary high water level is 967.5 feet.

6. The Association contends the State has unconstitutionally taken property by raising the ordinary high water level of the lake and permitting flooding.

■ The ordinary high water level is the boundary of public waters and wetlands. *Schalow,* 357 N.W.2d at 152; Minn. Stat. § 105.37, subd. 16. Its location is specifically set out by statute. *See id.* The Commissioner is authorized to determine the elevation as defined by statute. Minn.Stat. §§ 105.39, subd. 3, 105.43 (1984).

A determination of the ordinary high water level does not constitute a taking, for the Commissioner is merely determining which elevation constitutes "the highest water level which has been maintained for a sufficient period of time to leave evidence upon the landscape * * *." Minn.Stat. § 105.37, subd. 16.

Since Lake Pulaski's water level at the time of the hearing was below the ordinary high water level, allegations of flooding are premature.

The Association argues that there has been a taking because the ordinary high water level set by the Commissioner after the 1985 contested case hearing is higher than that set in 1964. However, the Commissioner found that the 1964 survey was for the purpose of determining whether certain fill was below the ordinary high water level and that there was no intention to formally establish the ordinary high water level at that time. There was no hearing, published notice, or legal proceeding. The Association does not dispute these findings. Indeed, it advocated an ordinary high water level higher than the one used in 1964.

### DECISION

The Commissioner did not err by failing to respond to the Association's letter before rendering his final decision. The Commissioner did not err by selecting an ordinary high water level not advocated by either party in the contested case. The Commissioner correctly applied Minn.Stat. § 105.37, subd. 16. Substantial evidence supports an ordinary high water level of 967.5 feet. An ordinary high water level determination does not constitute an unconstitutional taking of private property.

Affirmed.