In the Matter of the INSURANCE AGENTS' LICENSES OF David S. KANE, No. 0309330 and Michael Pohl, No. 0039512.

In the Matter of the INSURANCE AGENCY LICENSE OF FINANCIAL BENEFITS COMPANY.

No. CX–91–101.

Court of Appeals of Minnesota.

July 23, 1991.

Review Denied Sept. 25, 1991.

Carl E. Norberg, St. Paul, for relators Kane, Pohl and Financial Benefits Co.

Hubert H. Humphrey, III, Atty. Gen., Norine Olson–Elm, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Dept. of Commerce.

Michael D. McNair, Fargo, N.D., for amicus curiae, North Dakota Ass'n of Life Underwriters.

Considered and decided by CRIPPEN, P.J., and FOLEY and RANDALL, JJ.

## OPINION

FOLEY, Judge.

Relators David S. Kane, Michael Pohl and Financial Benefits Company obtained a writ of certiorari, seeking review of a decision by the Commissioner of Commerce which revoked their insurance licenses. We affirm the Commissioner's findings and conclusions, but remand for a redetermination of the appropriate sanction to be imposed.

## FACTS

Kane has been licensed for over 25 years as an insurance agent. In late 1986 or 1987, Kane formed Financial Benefits, a managing general agent for insurance companies. Financial Benefits is licensed as an insurance agency by respondent Minnesota Department of Commerce.

In 1987, Kane approached Western States Life Insurance Company about marketing a product called the "Senior Securi-ty Policy" (SSP), which Kane had been successfully marketing for another insurance company. The SSP is a universal life insurance policy targeted for senior citizens. Policy costs include service charges of 7.5% of each premium, monthly policy fees of $4.50, and monthly mortality charges.

Kane and Financial Benefits entered into a managing general agent agreement with Western States, which provided that Kane would recruit, train, and supervise sales agents for Western States. The agents signed independent contractor agreements with Western States; there were no written contracts between the agents and either Kane or Financial Benefits.

In 1987, Kane recruited Pohl as an agent to sell the SSP for Western States. Pohl had been licensed to sell life insurance in Minnesota since 1984. Pohl signed the independent contractor agreement with Western States and attended a one-and-one-half day training seminar conducted by Kane employees.

During 1988, Pohl sold 29 SSPs to Minnesota senior citizens. The sales were initiated by a general mailing of "lead materials" to senior citizens. The lead materials were mailed by Information Distribution Center, a corporation whose purpose was to function as an agency for insurance leads. The lead materials sent out by Information Distribution Center had been used in approximately 45 other states for four years before Kane began using them. Although the lead materials mentioned insurance, they also referred in large type to "Federal Estate Tax Information."

After receiving responses from the lead materials, Pohl called on prospective clients in their homes and presented the sales talk he had learned at Kane's seminar. *The written materials Pohl used in his presentation had been approved by Western States.* The 55 pages of written materials emphasized federal estate taxes and estate planning. Life insurance was not mentioned until page 47 of the materials.

The written materials included documents referring to state inheritance taxes

and federal estate taxes and costs. Pohl was aware when he made his sales presentations that Minnesota did not have a state inheritance tax. In addition, the materials did not reflect application of unified credit laws, so estate taxes were indicated as payable for small estates. Pohl knew at the time of each sale that none of his clients had a current estate tax liability.

At the time Pohl received an application for an SSP, he left behind with the client a brochure explaining the 7.5% premium deduction, the $4.50 policy fee deduction and the mortality cost deduction. Pohl did not explain these costs at the time of his initial presentation.

When Pohl received an application for an SSP, he submitted the application and the initial premium payment to Financial Benefits, who sent out a mailgram stating that the medical information in the application was being verified. A Financial Benefits representative then telephoned the client to state that a life insurance policy had been purchased. Subsequently, Financial Benefits sent a letter explaining that the client had purchased a universal life insurance policy. When the insurance application was approved by Western States, Financial Benefits mailed another letter stating that the policy was being sent to Pohl for delivery. When Pohl delivered the policy, two receipts were signed indicating that the client recognized he was purchasing insurance. The client then had a 20–day "free look" period, during which time he or she could elect to return the SSP for a refund.

In the summer of 1988, the Department became concerned about the marketing and sale of the SSP in Minnesota. After discussing its concerns with Western States and contacting some of Pohl's clients, the Department mailed a letter to the 29 policyholders, asking them to assist in an investigation. The letter stated that "numerous phone calls" had been received by individuals "evidencing considerable misunderstanding with respect to the content and/or structure of [the SSP] policies." *In fact, the Department had not received the alleged phone calls about the SSP.* This fact was not disputed by the Commissioner.

Western States also mailed a letter to the 29 policyholders, offering them the opportunity to return their SSPs for a full refund if they did not understand the costs involved. Several of the policyholders chose to obtain a refund after receiving notices from either the Department or Western States.

Between November 14, 1989 and January 10, 1990, an administrative law judge conducted a hearing on the matter of the sale of the SSP's in Minnesota. The ALJ heard testimony by several experts and 11 policyholders who had purchased SSPs from Pohl and had subsequently requested refunds. At the close of the hearing, the ALJ issued findings and a recommendation that the Commissioner of Commerce take disciplinary action against the licenses of Kane, Pohl and Financial Benefits. The ALJ found that Kane, Pohl and Financial Benefits had misrepresented the SSP and misled prospective purchasers into believing that the SSP was a "savings" or "investment plan" and that all premium payments would earn interest. The ALJ also found that Pohl failed to reveal the insurance policy costs until after the purchases had been made. The ALJ believed the sales materials were false and misleading because they implied that if the senior citizens did not purchase the SSPs, they would be subject to state inheritance and federal estate taxes.

A Deputy Commissioner of Commerce adopted the ALJ's findings and recommendation, and ordered the insurance licenses of Kane, Pohl and Financial Benefits revoked. Kane, Pohl and Financial Benefits obtained a writ of certiorari, seeking review of the Deputy Commissioner's decision.

### ISSUES

1. Does the record support the Commissioner's determination that Kane, Pohl and Financial Benefits had an agency relationship sufficient to hold Kane and Financial Benefits liable for Pohl's actions?

2. Did the sales of the SSPs take place at the time Pohl received applications for

the policies or later, when the policies were actually delivered to the senior citizens?

3. Was the Department required to prove its case against Kane, Pohl and Financial Benefits by clear and convincing evidence?

4. Did the Commissioner err by finding that Kane, Pohl and Financial Benefits misrepresented the SSPs or misled purchasers in violation of Department statutes and rules?

5. Was the Department required to prove that Kane, Pohl and Financial Benefits' misrepresentations were either intentional or negligent?

6. Did the Deputy Commissioner abuse her discretion by revoking Kane, Pohl and Financial Benefits' insurance licenses?

## ANALYSIS

### 1. Agency Relationship

■ Kane, Pohl and Financial Benefits argue the Deputy Commissioner erred by determining the parties had an agency relationship sufficient to hold Kane and Financial Benefits liable for Pohl's actions. It is Kane, Pohl and Financial Benefits' position that Pohl was an independent contractor for Western States, rather than an agent of Kane and Financial Benefits.

■ An agency relationship may be established even though the parties did not call it an agency relationship and did not intend the legal consequences of such relationship. *A. Gay Jenson Farms Co. v. Cargill, Inc.*, 309 N.W.2d 285, 290 (Minn. 1981). The three elements of an agency relationship are: (1) consent to the agency; (2) action by the agent on behalf of the principal; and (3) exercise of control by the principal over the agent. *See id.* at 290–91.

■ Although the existence of an agency relationship is ultimately a legal determination, it is necessarily dependent upon the factual arrangement between the parties. *See PMH Properties v. Nichols*, 263 N.W.2d 799, 802–03 (Minn.1978).

Kane recruited Pohl and recommended to Western States that Pohl be hired. Pohl was trained by professional sales trainers,

who were Kane's employees. Kane provided Pohl an office, and spoke to him every Saturday on the telephone. Kane received applications and premium checks from Pohl and received overrides from Pohl's sales.

Kane had the authority from Western States to supervise Pohl and other agents. Pohl testified that someone from Kane's office witnessed 10 or 12 of his sales presentations. Kane testified that a sales manager went with Pohl for a week and reported that Pohl had done a good job.

Finally, Kane's managing general agent (GA) contract with Western States consistently referred to the "GA's agents." This contract also provided that Kane would hold Western States harmless for Pohl's acts.

We conclude the above evidence was sufficient as a matter of law to support the Commissioner's conclusion that an agency relationship existed between Kane, Pohl and Financial Benefits.

### 2. Time of Sale

■ The Commissioner determined that Pohl failed to reveal the SSP costs and charges until after he had finalized a sale. Pohl admitted that he did not explain the SSP costs during his initial sales presentation; rather, those costs were explained in "leave behind" materials. Kane, Pohl and Financial Benefits argue that at that point, the actual sale of the SSP had not yet taken place; rather, the sale either took place when the policy was delivered to and accepted by the purchaser, or following the 20–day "free look" period. We disagree.

Under the specific facts of this case, the Commissioner properly concluded the sale of an SSP took place following the initial sales presentation, when the client submitted an application and tendered an initial premium payment. The terms of the application specifically provided for coverage beginning on the date of application. *Cf. Olson v. American Cent. Life Ins. Co.*, 172 Minn. 511, 216 N.W. 225 (1927) (application for insurance was a mere proposal where the application stated that insurance was not effective until approval).

### 3. Burden of Proof

■ Minn.R. 1400.7300, subpt. 5 (1989) states that unless the substantive law provides a different burden or standard, the applicable burden of proof in hearings conducted by an ALJ is the preponderance of the evidence standard. Kane, Pohl and Financial Benefits argue this rule is violative of equal protection, since their insurance licenses may be revoked pursuant to this lower standard, whereas attorneys' licenses may not be revoked unless their alleged misconduct is proven by the higher clear and convincing evidence standard.

In *In re Wang*, 441 N.W.2d 488 (Minn. 1989), a dentist raised this equal protection argument, but the court refused to address the issue because it had been raised for the first time on appeal. Here, Kane, Pohl and Financial Benefits raised their equal protection arguments below.

Although applying the preponderance of the evidence standard, the *Wang* court noted:

> Attorney discipline proceedings, under the supervision and control of the judiciary, are sui generis. Attorney misconduct, striking as it does at the administration of our justice system, gives society a heightened interest in the outcome of attorney discipline. A higher standard of proof is indicated.

*Id.* at 492 n. 5 (citation omitted). We believe these distinctions provide a rational basis for employing the clear and convincing standard in attorney licensing proceedings and the preponderance of the evidence standard in other licensing proceedings. As the *Wang* court recognized, attorney discipline proceedings are "sui generis."

We find additional support for our conclusion in the case of *In re Polk,* 90 N.J. 550, 449 A.2d 7 (1982). There, the New Jersey court distinguished between legal and medical disciplinary proceedings, noting that discipline of the legal profession is reposed in the court, rather than the legislative branch of government. The court also recognized that the legal profession is much more subject to accountability. The *Polk* court therefore concluded there was an adequate basis for applying differing standards of proof in medical and legal disciplinary proceedings.

Although we conclude the Commissioner here correctly employed the preponderance of the evidence standard, we point out the following language in *Wang:*

> Even so, these proceedings brought on behalf of the state, attacking a person's professional and personal reputation and character and seeking to impose disciplinary sanctions, are no ordinary proceedings. We trust that in all professional disciplinary matters, the finder of fact, bearing in mind the gravity of the decision to be made, will be persuaded only by *evidence with heft.* The reputation of a profession, and the reputation of a professional as well as the public's trust are at stake.

*Wang,* 441 N.W.2d at 492 (emphasis added). Accordingly, we review the record in the usual manner to determine whether the Commissioner's decision is "[u]nsupported by substantial evidence." Minn.Stat. § 14.-69(e) (1988). In this professional disciplinary matter, however, we must be careful to consider whether the substantial evidence supporting the Commissioner's decision may be characterized as "evidence with heft."

### 4. Misrepresentations

■ The Commissioner gave three reasons for revoking Kane, Pohl and Financial Benefits' insurance licenses. The Commissioner first found that Pohl's statements or omissions misrepresented the SSP and misled the purchasers. The Commissioner next found that the sales materials were false and misleading. Finally, the Commissioner concluded Pohl's entire sales approach was misleading and misrepresented the terms of the SSP. The Commissioner based his reasons upon the following violations:

> (a) The Commissioner may by order suspend or revoke an insurance agent's or agency's license * * * if, after notice and hearing, the Commissioner finds as to that licensee any one or more of the following conditions:

>     *      *      *      *      *      *

(3) violation of, or noncompliance with, any insurance law or violation of any rule or order of the Commissioner;

\* \* \* \* \* \*

(6) misrepresentation of the terms of any actual or proposed insurance contract;

Minn.Stat. § 60A.17, subd. 6c(a)(3), (6) (1988).

Making, issuing, circulating, or causing to be made, issued, or circulated, any estimate, illustration, circular, or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby or the dividends or share of the surplus to be received thereon, \* \* \* shall constitute an unfair method of competition and an unfair and deceptive act or practice in the business of insurance.

\* \* \* Making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in a newspaper, magazine, or other publication, or in the form of a notice, circular, pamphlet, letter, or poster, or over any radio station, or in any other way, an advertisement, announcement, or statement, containing any assertion, representation, or statement with respect to the business of insurance, or with respect to any person in the conduct of the person's insurance business, which is untrue, deceptive, or misleading, shall constitute an unfair method of competition and an unfair and deceptive act or practice.

Minn.Stat. § 72A.20, subds. 1, 2 (1988).

No advertisement or representation, written or oral, may omit information or use words, phrases, statements, references, or illustrations if the omission of the information or use of the words, phrases, statements, references, or illustrations has the capacity, tendency, or effect of misleading or deceiving purchasers or prospective purchasers as to the nature or extent of any policy benefit payable, loss covered, or premium payable. The fact that the policy offered is made available to a prospective insured for inspec-

tion prior to consummation of the sale or an offer is made to refund the premium if the purchaser is not satisfied does not remedy misleading statements.

Minn.R. 2790.0500, subpt. 1 (1989).

The Commissioner determined that Pohl's representations about the SSP were misleading because he did not mention the 7.5% premium deduction, the monthly $4.50 policy fee deduction, or the monthly mortality charge during his sales presentation. Pohl admitted it was not routine to mention the costs; this information was only mentioned in a "leave behind" brochure after he had already received an application for insurance and a check for the first premium. No subsequent letters from Financial Benefits contained information regarding these charges. Seven senior citizens testified at the hearing that they were not told or did not know about these charges. Four purchasers testified that they believed all of their premiums would earn interest. However, two purchasers testified that Pohl told them about at least some of the charges.

The Commissioner also found that several of Pohl's clients did not understand they were purchasing insurance. One witness did understand the SSP was an insurance policy. Two other witnesses understood they were purchasing insurance; however, one was told by Pohl that the SSP was a "savings plan," and Pohl represented the SSP to the other as an "investment plan." Other witnesses believed the policy was either a savings plan, a savings plan with a death benefit feature, or an investment plan rather than an insurance policy.

Kane, Pohl and Financial Benefits argue there is evidence in the record that the insurance policy did have savings and investments aspects. In fact, an expert witness testified that the SSP had two features: insurance and savings. However, another expert testified that the SSP was not a unique type of insurance and should not be considered a savings plan or an investment.

Department rules provide:

It is unfair and deceptive to use the terms "investment," "investment plan,"

"expansion plan," "profit," "profit-sharing," and other similar terms in connection with life insurance policies, * * * in a context or under such circumstances or conditions as to have a capacity or tendency to mislead a purchaser or prospective purchaser of such policy or contract to believe that he will receive, or that it is possible that he will receive, something other than a life insurance policy * * *.

Minn.R. 2700.3200, subpt. 5 (1989).

Kane, Pohl and Financial Benefits argue the letter the Department mailed to the 29 senior citizens precipitated their concern about the SSPs and led to their cancellations of the policies. In fact, one witness testified that he became scared when he received a call from the state and heard on television and through the newspapers about the investigation. His wife testified that she believed there was a problem and perhaps a discrepancy; therefore, she wanted her money back. However, she also testified that she would not have bought the SSP if she had known it was insurance. Several other witnesses testified that they cancelled their policies because they wanted savings, not insurance, did not understand the SSP was an insurance policy, or did not know about or understand the charges.

The Commissioner found that Kane, Pohl and Financial Benefits used false and misleading sales materials in the process of selling the SSP. The Commissioner cited three documents as false and misleading: (1) an illustration entitled "Losses Now–Future Losses"; (2) a document entitled "Everyone Has to Pay"; and (3) a schedule of estate and gift taxes.

As the Commissioner found, the "Losses Now–Future Losses" document listed inheritance taxes under the "future losses" category, and, according to the testimony, none of the 29 senior citizens would be subject to inheritance taxes. However, an attorney for Western States explained that an attempt had been made to keep the sales materials as generic as possible; the company tried not to print special materials for specific states. Western States relied on the agents to explain each state's requirements. An expert witness for Kane, Pohl and Financial Benefits testified that under the generic list, the state inheritance tax could be valued at zero.

The Commissioner also found misleading the document entitled "Everyone Has to Pay," which provided three celebrity examples of estate settlement costs. Based on expert testimony, the Commissioner found that the celebrity examples contained outdated information under current law.

The Commissioner found the schedule of estate and gift taxes implied that small estates would be taxed. The Commissioner found that Pohl was aware none of the senior citizens had a federal estate tax liability, since estates less than $600,000 were exempt. In addition, the Commissioner noted the schedule of estate and gift taxes did not reflect the unified credit laws, so taxes were shown as payable for small estates. Although unified credit was noted below the schedule, it was not explained in the document.

The above evidence supports the Commissioner's finding that the statements and omissions, sales materials, and entire sales approach were misleading and misrepresented the SSP.

### 5. Intent/Negligence

Kane, Pohl and Financial Benefits argue the statutory prohibitions against misrepresenting insurance products require that the person who misrepresents the product be guilty of intentional or negligent misrepresentation. This issue turns upon the legislature's intent in employing the terms "misrepresenting" and "misleading."

The legislature did not itself specifically qualify these terms by requiring scienter. Minn.Stat. § 60A.17, subd. 6c(a)(3), (6); Minn.Stat. § 72A.20, subds. 1, 2. To ascertain the legislature's intent, we may examine the insurance statutes as a whole. See Minn.Stat. § 645.17 (1988). Notably, in other provisions of the insurance statutes, the legislature has required intent or willfulness. See, e.g., Minn.Stat. §§ 60A.08, subd. 9; 60A.17, subd. 6; 72A.20, subds. 6, 12 (1988). Accordingly,

we view as intentional the legislature's failure to qualify the terms "misrepresenting" and "misleading" in the statutes at issue here.

We note that in *In re Sentry Ins. Payback Program Filing,* 447 N.W.2d 454 (Minn.App.1989), this court interpreted the meaning of the term "misleading" as used in another Department statute, Minn.Stat. § 70A.06, subd. 2 (1988). The *Sentry* court discussed other definitions of "misleading":

> Statements are misleading if they "tend to lead astray or into error, *without any specific intent to deceive.* * * *" The determination of whether a statement is misleading is based on the overall impression created by the statement. * * * The total impact may be deceptive or misleading even though the statement is technically not false.

*Id.* at 457 (citations omitted) (emphasis added).

While we conclude neither intent nor willfulness is an *essential* element of these statutes, we believe some element of scienter is required. However, we conclude the extent of culpability is relevant only to the extent of sanctions to be considered by the Commissioner.

### 6. Sanctions

Kane, Pohl and Financial Benefits vehemently dispute the Deputy Commissioner's choice of sanctions, arguing the revocation of their licenses was too extreme and in effect constituted "economic capital punishment." While not necessarily adopting Kane, Pohl and Financial Benefits' characterization that the sanctions result in "economic capital punishment," we hold the sanctions are too severe.

■ We recognize that the imposition of a sanction lies within the discretion of an agency. *In re Haugen,* 278 N.W.2d 75, 80 n. 10 (Minn.1979). We are firmly convinced, however, that the Deputy Commissioner abused her discretion by revoking Kane, Pohl and Financial Benefits' licenses. We are not unmindful of the seriousness of their behavior, particularly since the victims were senior citizens—a group sometimes characterized as especially vulnerable. Nevertheless, it is undisputed that all of the victims ultimately received reimbursements upon request.

In addition, we note: (a) the Department's own letter to the policyholders was misleading; (b) *there was no determination that the lead materials were in violation of Minnesota law;* (c) there was no evidence of any prior history of questionable conduct by Kane or Pohl; and (d) none of the senior citizen witnesses testified that they relied upon the sales materials which the Commissioner found to be misleading. In short, we are not persuaded that "evidence with heft" supports the revocation of Kane, Pohl and Financial Benefits' licenses.

We find particularly significant the fact that prior to the hearing, the Commissioner agreed to settle this matter with Western States for $5,000 under a consent order, in part due to Western States' voluntary refund offer to Minnesota SSP policyholders. In the consent order, the Commissioner found Western States' actions "were not taken with any intent to deceive, defraud or in any manner harm the interests of any [SSP] applicants."

We fail to see why Western States should receive in effect little more than a slap on the wrist, while its agents in the field should be expected to suffer the loss of their licenses. When considering the sanctions imposed in this case, it is to be noted that, although Kane recruited, trained and supervised the agents, their contracts were with Western States, not Kane. Western States, not Kane, made the hiring decisions, and Western States, not Kane, could unilaterally decide to terminate an agent. Western States paid the agents directly and required that it be *allowed to review all materials regarding its company or policies before the materials were used.*

■ Under these facts, the Commissioner imposed the drastic sanction of loss of license on the field agents, though at the same time determined the conduct of Western States not to be drastic at all. The assessment of penalties and sanctions by an administrative agency is not a factual

finding but the exercise of a discretionary grant of power. *See Haugen,* 278 N.W.2d at 80 n. 10. However, *Haugen* also holds that the agency's discretion is not unfettered and if the discretion is abused, the sanctions will be set aside on appeal. *Id.*

Applying the standard set out in *Haugen* to the case at hand, the imposition of loss and revocation of license was a drastic sanction and amounted to a clear abuse of discretion.

In its consent order, the Commissioner prohibited Western States from marketing or issuing SSPs in Minnesota without filing certain documents with the Commissioner in accordance with Minn.Stat. ch. 72C. A similar prohibition, perhaps in conjunction with a suspension, would appear equally appropriate in Kane, Pohl and Financial Benefits' situation.

In remanding this case for sanctions short of loss and revocation of license, we are not saying that we condone the giving of misleading or confusing information to senior citizens. However, the sanction imposed must not exceed what is necessary to protect the public and to deter such conduct in the future. *See In re N.P.,* 361 N.W.2d 386, 393 (Minn.1985), *appeal dismissed,* 474 U.S. 976, 106 S.Ct. 375, 88 L.Ed.2d 330 (1985).

### DECISION

We affirm the Commissioner's findings and conclusions in part, but remand for reconsideration of appropriate sanctions short of total loss of license.

Affirmed in part and reversed and remanded in part.