JOSEPH C. LENIHAN AND ANOTHER v. TRI-STATE
TELEPHONE AND TELEGRAPH COMPANY
AND OTHERS.
CITIES OF ST. PAUL AND MINNEAPOLIS,
INTERVENERS-RESPONDENTS.[1]

July 5, 1940.

No. 32,425.

[1]Reported in 293 N. W. 601.

C. B. *Randall, Ralph A. Stone,* and *Tracy J. Peycke,* for appellant.

*David J. Erickson* and *Arthur Le Sueur,* for respondents.

*John W. McConneloug* and *Louis P. Sheahan,* for intervener City of St. Paul.

*R. S. Wiggin,* City Attorney, and *John F. Bonner,* Assistant City Attorney, for intervener City of Minneapolis.

HOLT, JUSTICE.

The state railroad and warehouse commission, hereinafter referred to as the commission, in 1929 instituted a proceeding against the Tri-State Telephone and Telegraph Company, hereinafter named the company, to inquire as to the reasonableness of its telephone rates in the St. Paul Metropolitan Exchange Area. It was an adversary proceeding wherein, after protracted hearings and voluminous testimony taken, the commission filed its order March 31, 1936, promulgating a schedule of rates. From this order the company appealed to the district court, claiming, among other things, that the rates fixed were confiscatory. A long trial resulted in an affirmance of the commission's order. An appeal by the company to this court followed. The court below was affirmed. State v. Tri-State Tel. & Tel. Co. 204 Minn. 516, 284 N. W. 294. Stays for rehearing and looking to a review of our decision by the Federal Supreme Court were granted. Meanwhile negotiations were had between the company and the commission, in which the attorney general participated, looking toward a settlement of the controversy. The order of March 31, 1936, affected only the St. Paul Metropolitan Exchange Area. The city of Minneapolis, served by the Northwestern Bell Telephone Company, was eager to avail

itself and its residents of the reduced rates established in the St. Paul area. While the motion for rehearing was still pending the parties agreed to end further litigation in this manner: The company would allow judgment to be entered in the pending proceeding, proceed with the payment of refunds therein provided for subscribers, and adopt the new schedules. The new schedule of rates was approved by order of the commission filed May 2, 1939. The company made and filed the new schedule, effective June 1, 1939; this included a like approved schedule by the Northwestern Bell Telephone Company for the Minneapolis Metropolitan Exchange Area. After this order was filed a remittitur to the district court went down, and therein judgment was entered May 18, 1939, ending the litigation concerning the commission's order of March 31, 1936. Further facts need not be here set out. A full statement is to be found in our decision in 204 Minn. 516, 284 N. W. 294.

May 22, 1939, plaintiffs, in their own behalf as users of the telephone service and patrons of the company and in behalf of others in like situation, brought this action to vacate and set aside as void the commission's order filed May 2, 1939, and to enjoin its being put in operation. The company is made defendant, also the commission and its members individually, and the attorney general. Afterward the city of St. Paul and the city of Minneapolis intervened. All parties interposed pleadings. On plaintiffs' motion, judgment was granted on the pleadings. The judgment decrees void the commission's order of May 2, 1939, insofar as the schedule of rates affects the St. Paul Metropolitan Exchange Area and enjoins the defendants from enforcing the same, decrees therein all charges in excess of those fixed by the order of March 31, 1936, unlawful, unreasonable, and arbitrary, and requires the company to refund such excess, if collected, with interest. Other relief granted need not be stated. The company appeals from the judgment. Plaintiffs have filed briefs in support

of the judgment; so has the intervener city of St. Paul. The intervener city of Minneapolis joins with the company in the contention that the order of May 2, 1939, is valid and in effect within the Minneapolis area.

There are six assignments of error in this court; but, in view of the conclusion reached, we need only consider those which assail the judgment because decreeing the commission's order of May 2, 1939, void. If the commission under the law had the authority and power to make that order the judgment must be reversed. The order is set out in the margin.[3]

---

[3]"In the Matter of Rates and Charges for Exchange Telephone Service by The Tri-State Telephone and Telegraph Company in the St. Paul Metropolitan Area and by the Northwestern Bell Telephone Company in the Minneapolis Metropolitan Area.

"M-1956 and M-2363

"The Railroad and Warehouse Commission of Minnesota on its own motion, by a Resolution and Order dated February 15, 1932, instituted proceedings in an investigation of the reasonableness of all schedules of exchanges rates and charges maintained and collected by The Tri-State Telephone and Telegraph Company within the St. Paul Metropolitan Area. Hearings were held throughout the years 1932, 1933 and were concluded in the year 1934. That proceeding and the investigation thereunder culminated in an Order reducing rates and prescribing a new·schedule of rates and charges to be effective June 1, 1936, throughout said area.

"The Tri-State Company effected an appeal from that Order to the Ramsey County District Court where the Commission's Order was affirmed, whereupon appeal was taken by the Tri-State Company to the State Supreme Court, which Court, on February 24th last, issued its opinion affirming the decision of the District Court. The Tri-State Company then, upon application, secured from the State Supreme Court a Stay of Execution of Judgment until June 5th next, during which time the Company might give consideration to and, if so determined, file and perfect further appeal.

"The litigation so far carried appears to have settled certain questions of law as to which there had been uncertainty, and it seemed to the Commission that with these questions settled there should be a possibility and particularly a desirability of securing an immediate reduction in rates which would be fair and reasonable and which might be acceptable to the company without longer continuing the litigation by further appeals or procedure before the courts.

We assume for the purposes of this decision that the suit is properly brought by plaintiffs; that they have no adequate remedy at law; and that the statutes do not provide an exclusive remedy. Under the common law, public utilities

---

"The Commission has, for the past year and a half, carried on an investigation of telephone rates in Minneapolis, and has concluded that a reduction is justified there as well as in St. Paul. It seemed too that, with the decision in the St. Paul case, a revised rate schedule for Minneapolis might be arrived at without the delay of prolonged hearings before the Commission and possible subsequent appeal to the courts. In addition such a settlement would save the State and the Company the expense of further valuation proceedings in Minneapolis.

"Accordingly the Commission summoned to appear before it officials of The Tri-State Company and the Northwestern Bell Telephone Company for purposes of discussion and consideration of what might be accomplished. These telephone officials immediately pointed out that the rates ordered by the Commission for the St. Paul area had been arrived at from consideration by the Commission of evidence in that case upon data none of which was later than for the year 1933, and that, without regard to conditions then existing, such rates are not now adequate by reason of changed conditions since that time.

"The Commission thereupon had its forces make a careful analysis of changes which had occurred in the telephone property, in revenues and expenses. They reported that changes in the property had increased its value since 1933; that costs of some materials and of labor had increased and, in addition, by reason of Federal and State Social Security taxes, changes in Federal and State Income Taxes, the State money and credits tax, and an increase in the State gross earnings tax from 4 per cent to 7 per cent, the cost of rendering telephone service has increased.

"After consideration and consultation with the Attorney General, the Commission arrived at a schedule of rates which are materially lower than those now being charged by the telephone company.

"The Commission advised the companies of its conclusions and, after several conferences, the telephone companies agreed to accept the proposed schedules both as to St. Paul and Minneapolis, it being understood, of course that, after actual experience was obtained, either the Commission or the Company might seek modification.

"The Tri-State Company further agreed that it would take no appeal from the Supreme Court decision in the pending case, but would allow judgment to be entered and then proceed to make refunds to its subscribers as required by the District Court decision, thus terminating that litigation.

fixed their charges or rates for services as they saw fit; but, since their business is "affected with a public interest," governments have taken measures to regulate, control, and fix

"It Is Found, that the following schedule of rates and charges for the named classes of exchange service in the St. Paul Metropolitan Area and in the Minneapolis Metropolitan Area are fair and reasonable, viz.:

| "Class of Service: | Net Monthly Rates Now Being Charged | Net Monthly Rates Herein Ordered | Reduction |
|---|---|---|---|
| "BUSINESS: | | | |
| 1 Party Flat Rate | $10.00 | $ 8.25 | $1.75 |
| 1 Party Message Rate | 5.50 | 5.00 | .50 |
| 2 Party Flat Rate | 8.00 | 7.00 | 1.00 |
| 4 Party Flat Rate (Outside Base Area) | 8.00 | 7.25 | .75 |
| Incoming | 6.00 | 5.50 | .50 |
| Semi-Public | 6.00 | 5.50 | .50 |
| "TRUNKS: | | | |
| Family Hotel | 15.00 | 14.00 | 1.00 |
| Family Hotel—Incoming | 7.50 | 7.00 | .50 |
| Hotel Flat Rate | 15.00 | 14.00 | 1.00 |
| Commercial Flat Rate | 15.00 | 14.00 | 1.00 |
| Commercial Flat Rate—Incoming | 7.50 | 7.00 | .50 |
| "RESIDENCE: | | | |
| 1 Party Flat Rate | 3.50 | 3.00 | .50 |
| 2 Party Flat Rate | 2.75 | 2.50 | .25 |
| 2 Party Message Rate | 2.25 | 2.00 | .25 |
| 4 Party Flat Rate (Outside Base Area) | 3.00 | 2.50 | .50 |
| Multi-party Flat Rate (Rural) | 2.50 | 2.25 | .25 |
| Service Stations | 1.00 | .75 | .25 |
| "PRIVATE BRANCH EXCHANGES: | | | |
| Private Residence Trunks | 5.25 | 5.00 | .25 |
| "NEW BRIGHTON: (Special one-party Service) | | | |
| 1 Party Flat Rate—Business | 14.00 | 13.00 | 1.00 |
| 1 Party Flat Rate—Residence | 7.75 | 7.00 | .75 |
| "NO. ST. PAUL & ST. PAUL PARK: (Local Zone Service) | | | |
| 1 Party Flat Rate—Business | 3.50 | 3.25 | .25 |
| 1 Party Flat Rate—Residence | 2.25 | 2.00 | .25 |
| 2 Party Flat Rate—Residence | 2.00 | 1.75 | .25 |

rates to the end that they may be just and reasonable and not confiscatory. In this state by statute the intrastate rates of telephone companies, of railroads, and of other public utilities have been delegated to the commission. The statutes prescribe the procedure. 1 Mason Minn. St. 1927, § 5289, relating to telephone companies, requires rates to be fair and reasonable and declares unreasonable rates unlawful. The next section provides that the rates of the companies shall be filed with the commission. Section 5291 reads:

"Whenever such rates or schedules are found to be unreasonable by the commission, upon its own motion or upon complaint, it shall prescribe reasonable rates to take the place of those found unreasonable and such new rates shall be filed in place of the rates or schedules superseded. No rates filed with the commission shall be changed by any telephone company without an order of the commissioner sanctioning the same. It shall be unlawful for any telephone company to collect or receive a greater or less rate or charge

---

"The Commission finds that the valuation of the Company's property in St. Paul brought down to date, taking into account the additional investment since 1933, is in excess of the fair value for rate making purposes established as of said date. A test of the proposed schedule of rates applied to the actual operations of 1938 in St. Paul discloses that, if it had been effective in 1938, these rates would have been sufficient to meet all operating expenses including taxes and provide a reasonable return upon the fair value of the property in 1938. Similar tests as to Minneapolis indicate likewise their reasonableness as to that exchange.

"It Is Therefore Ordered, That the schedule of rates and charges above set forth shall be placed in effect in both the Minneapolis and St. Paul Metropolitan Areas effective on billing dates on and after June 1, 1939, the other rates and charges now in effect and not included above to remain unchanged, all to be effective within the month of June, 1939.

"By The Commission,

"OLIVER A. OSSANNA,

"Secretary.

"(Seal)

"Dated at St. Paul, Minnesota this 2nd day of May, 1939."

for any intrastate service rendered by it than the rate or charge named in the schedules on file with the commission, and no new rate shall take effect till the date named by the commission, which shall not be less than ten days after it is filed."

The section implies power in the commission to sanction and approve rates proposed by a telephone company. No procedure is prescribed where the commission of its own accord is of the opinion that the rates proposed are just and reasonable, except as certain sections relating to fixing intrastate rates for railroads are made applicable. If the change of rates is upon the commission's initiative, § 4646 is applicable; but if a change of rates is sought upon complaint of users or patrons of the telephone company, the proceeding must follow that indicated by 1 Mason Minn. St. 1927, §§ 4638 to 4641.

The theory of plaintiffs and the trial court, as set forth in the learned memoranda of 28 pages accompanying the order overruling defendants' demurrers to the complaint and the order for judgment on the pleadings, is that the order of May 2, 1939, is void because there was no notice of hearing, no testimony taken, and no findings of fact contained therein sufficient in law to sustain it. The company's view of § 5291 is that it has the right at any time to propose a new schedule of rates in place of the one in operation provided it is approved or sanctioned by the commission. In the case where a telephone company presents a proposal to increase or decrease or change its rates, it of course consents thereto, so that it cannot thereafter raise any claim that the rate is confiscatory. The commission in determining whether the proposed new schedule of rates is just and reasonable need not necessarily have a valuation of the company's property and a tedious and expensive litigation. It may already have knowledge of the situation. No statute is pointed to which prescribes that there must be notice given of hearings and testimony taken if the commission has all

the necessary information for determining whether the rates proposed to supersede those in force are just and reasonable. Under the admitted facts herein, it being conceded that the company accepts the rates fixed by the order of May 2, 1939, it can raise no question as to their being unreasonable or confiscatory. And as to plaintiffs, the users and patrons of the company, the argument can well be made that the order contains sufficient statement or findings of fact so as not to be vulnerable to attack from them. It states what is common knowledge, that labor and materials have greatly increased since the time the commission received the testimony upon which the order of March 31, 1936, is based, and that laws have since been passed casting heavy tax burdens upon the company. It should be noted that the commission in sanctioning proposed changes of rate schedules is performing a legislative function delegated to it. In so doing it represents the public—the patrons of the public utility. The patrons or users of the company's services have no vested rights to any fixed rates. In re Application of Northwestern Bell Tel. Co. 164 Minn. 279, 204 N. W. 873. In considering what the commission may lawfully do under § 5291, this language in Wisconsin Tel. Co. v. Public Service Comm. 232 Wis. 274, 306, 287 N. W. 122, 139, 593, is so pertinent that we quote:

"What must always be borne in mind is that there is a wide difference between what may be done by way of increasing or decreasing rates upon the application of the utility or decreasing rates against the protest of the utility. When rates are increased upon the application of the utility, the commission consents for the public and the resulting order is in effect a consent order. When rates are decreased upon application of the utility a like consent order results if the commission approves the decrease. The statute prohibits an increase or decrease of rates without the consent or approval of the commission. When, however, the utility objects and an issue is thus raised, the considerations which

then govern the action of the commission are entirely different. The commission must then proceed with full regard to the statutory and constitutional rights of the utility."

The commission's order of March 31, 1936, was an order of that sort; the order of May 2, 1939, was a consent order. The New Jersey statutes in relation to the powers of the public utility commissioners, though not the same as ours, appear to contemplate that the utility may by consent of the commissioners alter its established schedule of rates. O'Brien v. Board of Public Utility Commrs. 92 N. J. L. 44, 46, 105 A. 132, 133 (affirmed *Id*. 587, 106 A. 414), where it is said:

"The act provides not merely for proceedings *in invitum*, but by paragraph (h) of section 17, for agreement between the board and the 'public utility.' That paragraph provides for an increase of rates by the 'public utility' itself, authorizes the board to hear and determine whether the increase is just and reasonable, and makes it the duty of the board to approve the increase upon being satisfied that the same is just and reasonable. The difference in the two methods is fundamental. One is the method of litigation, long, expensive, unsatisfactory, necessarily too slow to afford prompt relief, and sure to do injustice by delay to one side or the other. The other we may call the method of agreement, or bargaining, if we choose; prompt and comparatively satisfactory, and resulting, if not always in abstract justice, yet in a determination, which in the hands of fair-minded men, is likely to be acquiesced in. * * * The contrast between the method of section 16 and the method of section 17 could not be better shown than it is by making the board the actor in section 16 (c), and making the 'public utility' the actor in section 17 (h)."

The conclusion of the court was adverse to the contention there advanced that the rates fixed by ordinances cannot be changed by consent of both the board and the utility. Both

plaintiffs and the company rely on Wichita R. & L. Co. v. Public Utilities Comm. 260 U. S. 48, 43 S. Ct. 51, 67 L. ed. 124. It is to be noted that the Wichita company had a long-time contract with the Kansas company, the utility, to furnish electric light and power at specified rates, which the commission changed. It is clear that upon such issue the patron of the utility had a right to findings as to whether or not the rates established by the commission did not unlawfully impair its contract rights. Morgan v. United States, 298 U. S. 468, 56 S. Ct. 906, 80 L. ed. 1288, held that the secretary of agriculture under the packers and stockyards act of congress, in fixing the maximum rates of charges of market agencies, must, under the act, grant hearings, and that in that action by such agencies to restrain the enforcement of rates as fixed the court below erred in striking a paragraph from the complaint which alleged that such hearing as called for by the act had not been had.

But it appears to us that regardless of the fact that the order of May 2, 1939, was made without notice of hearing, without the taking of testimony, and the claimed deficiency as to findings, it is nevertheless valid. The original litigation, instituted by the commission against the company in 1929, was still pending, and there was almost a certainty that it would be carried to the United States Supreme Court. Parties to litigation have the right to compose and agree to settle the dispute at any stage of the proceeding. There can be no doubt from the pleadings and the commission's order that the commission and the company did agree to settle the litigation then pending by superseding the company's rate schedule as fixed by the order of March 31, 1936, by that of the order of May 2, 1939. The attorney general conducted the litigation in behalf of the commission and also advised it in respect to the settlement thereof, by the order of May 2, 1939. The litigation had been carried on for over nine years at great expense. The commission had heard voluminous testimony upon all

phases that enter into the reasonableness of the company's rates. It knew what had transpired since such testimony was submitted in 1934. There is not the slightest hint in the record or in the argument of counsel that the agreement to end the litigation was not made in the utmost good faith. The commission (representing the public and the users of the company's services) and the company were the necessary parties to that litigation. The expenses had been enormous. More were in sight, together with uncertainty and delay, if the company's grievances were carried to the Supreme Court of the United States.

Plaintiffs contend that § 5298 of the code requires the commission to "give all interested parties a chance to furnish evidence and be heard." But that is when the commission deems it needful to have a valuation of all the property invested in the utility, as was done prior to the order of March 31, 1936. And of course then § 5307 applies.

We do not overlook the fact that the city of St. Paul and the city of South St. Paul—users of the company's services—were permitted to intervene in the original proceeding, and that the city of St. Paul is an intervener in this action. It does not appear that the city of St. Paul participated in the agreement which resulted in the promulgation of the order of May 2, 1939. But the commission represented one side—the public or users of the services—and the company the other side in the rate-fixing controversy. Those two were the necessary parties. The city of St. Paul stipulated as to the entry of judgment under the agreement. It must necessarily have had knowledge thereof. It did not ask the commission to vacate the order of May 2, 1939. It was willing to accept the refund decreed by the judgment. It waited until plaintiffs began this action and then asked leave to intervene. We do not think the city's nonparticipation in the settlement of the litigation vitiated the order made pursuant thereto; for, as stated, its interests were represented by the commission and attorney general.

A great array of decisions has been cited, quoted from, and discussed by plaintiffs and the city of St. Paul as to the necessity of hearings and testimony to sustain orders of commissions delegated with legislative function of determining rate schedules. But these decisions are of cases where the utility attacks the orders as confiscatory—depriving it of its property without due process of law. As illuminating an authority upon that branch of the law as any are the opinions of Mr. Chief Justice Hughes and Mr. Justice Brandeis in St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 73, 56 S. Ct. 720, 80 L. ed. 1033. Of course the commission must act within the scope of its authority and in the manner prescribed by the statutes. Western Buse Tel. Co. v. N. W. Bell Tel. Co. 188 Minn. 524, 248 N. W. 220, and Dayton Rural Tel. Co. v. N. W. Bell Tel. Co. 188 Minn. 547, 248 N. W. 218, are cited and relied upon by plaintiffs. Both were appeals by the public utility—the Northwestern Bell Telephone Company. In the first case the proceeding was instituted by users or patrons of the defendant utility filing a complaint against the utility. It was an adversary proceeding, and the court said [188 Minn. 530] that § 5308 contemplates that the commission will make definite findings, and also the district court, on appeal, must likewise make such findings where the question of confiscation is involved. The district court affirmed the commission but made no specific findings. The judgment was reversed for failure of the district court to make such findings. In the Dayton Rural Telephone case the judgment was reversed on the appeal of the utility because of noncompliance with the statutory provision under which the complaint by the users was made, viz., §§ 4638-4641.

. As we view this appeal, it can and should be disposed of on the ground that both sides to the pending litigation agreed to end the same by superseding the rate schedule

of March 31, 1936, by that of May 2, 1939.

The judgment is reversed.

MR. JUSTICE STONE and MR. JUSTICE PETERSON took no part.