### In the Matter of QWEST'S WHOLESALE SERVICE QUALITY STANDARDS.

#### No. A03–1409.

Court of Appeals of Minnesota.

April 13, 2004.

Jason D. Topp and Larry D. Espel, John M. Baker, Jeanette M. Bazis, Greene Espel P.L.L.P., Minneapolis, MN, for relator Qwest Corporation.

Mike Hatch, Attorney General, Steven H. Alpert, Cassandra Opperman O'Hern, Assistants Attorney General, St. Paul, MN, for respondent Minnesota Public Utilities Commission.

Virginia K. Zeller, Assistant Attorney General, St. Paul, MN, for respondent Minnesota Department of Commerce.

Dan M. Lipschultz, Michael J. Bradley, Moss & Barnett, P.A., Minneapolis, MN, for respondents McLeod USA, Inc., North-Star Access, LLC, Onvoy, Inc., U.S. Link, Inc., Encore Communications L.L.C., Integra Telecom of Minnesota, Inc., Global Crossing Local Services, Inc., New Edge Networks, Inc., Otter Tail Telecom, and VAL–AD Joint Venture, L.L.P. d/b/a 702 Communications.

Gregory R. Merz, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN; and Lesley J. Lehr, St. Paul, MN, for respondent WorldCom, Inc.

Karen L. Clauson, Eschelon Telecom of Minnesota, Inc., Minneapolis, MN, for respondent Eschelon Telecom of Minnesota, Inc.

Steven H. Weigler, AT & T Law Department, Denver, CO; and Thomas E. Bailey, Mark J. Ayotte, Briggs & Morgan, P.A., Minneapolis, MN, for respondent AT & T Communications of the Midwest, Inc.

W. Patrick Judge, Briggs & Morgan, P.A., St. Paul, MN, for respondent DIECA Communications, d/b/a Covad Communications Co.

Rebecca McElfresh Liethen, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for respondent Time Warner.

Considered and decided by RANDALL, Presiding Judge, HARTEN, Judge, and MINGE, Judge.

## OPINION

HARTEN, Judge.

Respondent Minnesota Public Utilities Commission (MPUC) issued an order imposing on relator Qwest Corporation, the incumbent local exchange carrier, benchmark service quality standards and an enforcement mechanism for those standards affecting wholesale transactions between Qwest and respondents competitive local exchange carriers (CLECs). Qwest un-

1. Qwest also moved this court for a protective order and a stay; this court granted the motion for protective order and denied the motion for stay.

2. Because the merger document also provided that Qwest had not "waived, compromised or limited" either any rights relating to matters then before the MPUC or any rights conferred by Minnesota law, Qwest did not waive

successfully moved for reconsideration and a stay of the order and appeals from the denial of these motions.[1]

## FACTS

Qwest agreed to "participate and cooperate in an expedited proceeding to establish permanent wholesale service quality (WSQ) standards" as a condition of MPUC approval of the merger of Qwest and U.S. West.[2] In July 2000, Qwest filed proposed WSQ standards that required parity between the services Qwest provided to the CLECs and the services Qwest provided to itself and its retail customers, but the proposed WSQ standards included no means of enforcing compliance. In December 2000, the CLECs and the Department of Commerce filed proposed WSQ standards that set benchmark levels of service and included an enforcement mechanism requiring Qwest to make payments to the CLECs or the state when Qwest's performance fell below the WSQ standards.

In March 2002, the MPUC rejected both sets of proposed standards and deferred action on the matter. In April 2002, the MPUC issued its own set of standards.

In July 2002, in connection with Qwest's petition to the Federal Communications Commission (FCC) for approval to offer certain long distance services, the MPUC adopted a Minnesota Performance Assurance Plan (MPAP) for Qwest that included parity WSQ standards. In August 2002,

its right to challenge the MPUC order. *See also TCG New York, Inc. v. City of White Plains,* 305 F.3d 67, 81–82 (2d Cir.2002) (holding that provision waiving a telecommunications provider's right to challenge a franchise in court was "completely unenforceable"), *cert. denied,* 538 U.S. 923, 123 S.Ct. 1582, 155 L.Ed.2d 314 (2003).

the MPUC asked Qwest and the CLECs to comment on the merits of the MPAP.

In October 2002, the CLECs proposed modifications to WSQ standards of the MPAP; these modifications included benchmark service levels and payments linked to failure to meet the benchmark service levels. Ultimately, over Qwest's objection, the MPUC adopted the CLECs' modifications to the WSQ standards included in the MPAP.

## ISSUES

1. Does the MPUC have authority to impose benchmark WSQ standards on Qwest?

2. Does the MPUC have authority to impose an enforcement mechanism on Qwest?

## ANALYSIS

**Standard of Review**

An agency exercises a legislative as opposed to a quasi-judicial function when it balances cost and noncost factors and makes choices among public policy alternatives. *Arvig Tel. Co. v. Northwestern Bell Tel. Co.,* 270 N.W.2d 111, 116 (Minn.1978). The agency acts in its legislative capacity in determining the extent to which competition should be permitted or limited. *Id.* at 116–17. When an agency exercises a legislative function, its decision is affirmed unless it is shown, by clear and convincing evidence, to be in excess of statutory authority or to have unjust, unreasonable, or discriminatory results. *City of Moorhead v. Minn. Pub. Utils. Comm'n,* 343 N.W.2d 843, 846 (Minn.1984). This court cannot substitute its judgment for that of an agency when the agency's finding is properly supported by the evidence. *Vicker v. Starkey,* 265 Minn. 464, 470, 122 N.W.2d 169, 173 (1963).

Qwest challenges the entire MPUC order and the penalty provisions in particular.

### 1. The MPUC Order

Qwest argues that the MPUC order exceeds its statutory authority because federal law both preempts regulation of intrastate telecommunications service and mandates parity standards and because state law, when properly construed, does not permit the MPUC order. Qwest also argues that the MPUC order is unsupported by the evidence.

### a. Federal Law

Qwest argues first that the Federal Telecommunications Act of 1996 (the Act) "withdrew from states and their commissions the power to adopt their own regulations and standards for competition." We disagree—the language of the Act itself refutes this argument. *See, e.g.,* 47 U.S.C. § 251(d)(3) (1996) (the FCC "shall not preclude the enforcement of any regulation, order, or policy of a State commission that (A) establishes access and interconnection obligations of local exchange carriers"); 47 U.S.C. § 252(e)(3) (1996) ("[N]othing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an [interconnection] agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements"); 47 U.S.C. § 253(b) (1996) ("Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safe-

guard the rights of consumers.");[3] 47 U.S.C. § 261(c) (1996) ("Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part or the Commission's regulations to implement this part.").

The Minnesota Federal District Court construed 47 U.S.C. § 252(e)(3) (1996) in *U.S. West Communications, Inc. v. Edward A. Garvey*, No. 97–913 ADM/AJB (D.Minn.1999):

> [T]he Act provides that a state commission can establish "other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements." 47 U.S.C. § 252(e)(3). It is appropriate for a state commission to implement its own state's laws during the review process so long as those laws do not conflict with or impede the federal act.

Both the Act and its construction by the federal district court defeat the argument that the Act deprives the MPUC of all authority to regulate intrastate telecommunications service.

■ Qwest asserts that the MPUC order violates 47 U.S.C. § 251(d)(3)(B) (1996), providing that state orders must be "consistent with the requirements of this section," because federal law mandates parity and the MPUC order mandates super-parity. Qwest also asserts that caselaw has construed 47 U.S.C. § 251(c)(2)(C)

(1996), requiring that incumbent local exchange carriers provide interconnection "that is at least equal in quality to that provided by the [incumbent] local exchange carrier to itself," to mandate parity standards. We disagree with both assertions.

The FCC view that this language "require[d] incumbent LECs to provide superior quality interconnection and network elements when requested" was rejected in *Iowa Utils. Bd. v. F.C.C.*, 120 F.3d 753, 812 (8th Cir.1997), *aff'd in part, rev'd in part, and remanded sub nom. AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (*Iowa Utilities I*). "[47 U.S.C. § 251(c)(2)(C)] does not mandate that incumbent LECs cater to every desire of every requesting carrier." *Id.* at 813.[4] The objective of *Iowa Utilities I* was to preclude competing carriers from forcing incumbent carriers to provide services superior to the services the incumbents provided to themselves. Here, the MPUC, not the competing carriers, is setting a minimum standard of service for Qwest; *Iowa Utilities I* does not preclude states from setting minimum standards.

Moreover, the MPUC order itself refutes Qwest's claim that "[its][p]urpose and [e]ffect ... is [s]uper-[p]arity." Its language reveals that its purpose is to remedy some of the deficiencies in parity standards:

> * Parity standards are not designed to ensure high quality service. Benchmark standards are.
>
> * Parity standards can potentially impede the development of competitive

---

**3.** *See Nixon v. Mo. Mun. League*, —— U.S. ——, 124 S.Ct. 1555, —— L.Ed.2d —— (2004) (the 47 U.S.C. § 253 prohibition of "ability of any entity" to provide telecommunications services does not apply to subdivisions of states).

**4.** On remand, *Iowa Utils. Bd. v. F.C.C.*, 219 F.3d 744, 748 (8th Cir.2000) (*Iowa Utilities II*) noted that "[t]he Supreme Court did not address the part of our opinion vacating the [FCC's] superior quality rules."

markets because they are not always competitively neutral. They place one actor in a competitive market in a position to influence the service quality provided to all other competitors. And, because competitors may have different sensitivities to service quality fluctuations, a standard that permits fluctuations may affect carriers in an unequal way. Benchmark standards improve predictability and reduce the influence that any competitor can wield over any other.

\* Parity standards can impede the development of a competitive market because they deprive competitors of the fundamental information that they need to sell their products. A benchmark standard provides that information.

Qwest argues that "Congress, the FCC and the Eighth Circuit have all decided that parity is *the* controlling legal standard for regulating competition." (Emphasis added.) But, as the language of the Act indicates, parity is not *the* controlling legal standard; it is *a* controlling legal standard. In the event that the benchmark standards exceed the standards of Qwest's wholesale service to its own retail customers, Qwest, not the MPUC, has authority to decide whether to upgrade that service.

The MPUC order does not violate federal law.

#### b. State Law

■ The MPUC order relies on Minn. Stat. § 237.16, subd. 8 (2002):

[T]he commission shall adopt rules applicable to all telephone companies and telecommunications carriers ... using any existing federal standards as minimum standards and incorporating any additional standards or requirements necessary to ensure the provision of high-quality telephone services through-out the state. The rules must, at a minimum

. . .

(7) protect against cross-subsidization, unfair competition, and other practices harmful to promoting fair and reasonable competition.

Qwest asserts that the MPUC erred in relying on Minn.Stat. § 237.16 (2002) because, if the statute is construed broadly enough to permit the MPUC order, it conflicts with the Act, which was adopted after the statute was enacted. For this assertion, Qwest relies on *Martin ex rel. Hoff v. City of Rochester*, 642 N.W.2d 1, 17 (Minn.2002) (when one reading of a statute conflicts with federal law, the court "will then look further to determine whether the statute is susceptible to another interpretation that does not raise a constitutional defect"), *cert. denied*, —— U.S. ——, 123 S.Ct. 2668, 156 L.Ed.2d 655 (2003). But Minn.Stat. § 237.16 (2002) unambiguously provides that the MPUC is to adopt rules, using federal standards as a minimum, that ensure high-quality telephone services and that protect against practices harmful to promoting fair competition. The MPUC order does exactly that: it does not set standards below the federal standards; its benchmark standards have the objective of ensuring high-quality service; and it promotes competition. Qwest claims that reading the statute to preclude the MPUC order is merely giving it a narrow interpretation; in fact, such a reading ignores the plain meaning of the statute. *See State by Beaulieu v. RSJ, Inc.*, 552 N.W.2d 695, 701–02 (Minn.1996) (when a statute is unambiguous, the court must apply its plain meaning). The MPUC order does not contravene Minn. Stat. § 237.16 (2002).

#### c. Evidence

Qwest argues that, because the MPUC made no finding that Qwest's service is

poor, the benchmarks in the order are not properly supported by the evidence.[5] But the need to establish minimum levels of service is not dependent on the existence of poor service. The MPUC is not only obligated to require improvements when the service level is unacceptable; it must also ensure that the level of service does not deteriorate. *See* Minn.Stat. § 237.16, subd. 8 (2002) (the MPUC is "to ensure the provision of high-quality telephone services throughout the state").

### 2. The Penalty Payments

■■■ "[T]he assessment of penalties and sanctions by an administrative agency is not a factual finding but the exercise of a discretionary grant of power." *In re Haugen,* 278 N.W.2d 75, 80 n. 10 (Minn. 1979). "A reviewing court, therefore, may not interfere with the penalties or sanctions imposed by an agency decision unless a clear abuse of discretion is shown by the party opposing the decision." *In re Henry Youth Hockey Ass'n,* 511 N.W.2d 452, 456 (Minn.App.1994), *modified,* 559 N.W.2d 410 (Minn.1994).

For failure to meet the benchmark standards, the MPUC order imposes on Qwest penalty payments to be made to the CLECs and to the state. Qwest argues that the penalty payments (1) exceed the MPUC's statutory authority; (2) are unsupported by the evidence; and (3) constitute an unlawful taking of MPUC's property.

#### a. *Statutory Authority*

■■■ The MPUC relied on the federal district court's construction of Minn.Stat. § 237.16, subd. 8 (1998).

The MPUC's authority to implement performance penalties can be fairly implied from its power "to *ensure* the provision of high quality telephone services...." Minn.Stat. § 237.16, subd. 8 (emphasis added). As the MPUC noted, penalties are necessary to give meaningful effect to the quality standards in the Agreements.... Without the penalties, an incumbent LEC, in order to gain a competitive advantage, might be inclined to cause delay in the provision of quality services to CLECs and thereby hurt the end-customer. The penalties provision prevents this behavior and ensures that high quality service reaches the customer. Possessing the requisite authority under state law, the MPUC may, under § 252(e)(3), impose the quality standards and penalty provisions at issue.

*U.S. West v. Edward A. Garvey,* No. 97–913 ADM/AJB (D.Minn.1999).

Qwest claims that this reliance is misplaced because *Garvey* does not address Minn.Stat. § 14.045, subd. 1 (1998) (an agency "may not, under authority of rule, levy a total fine or penalty of more than $700 for a single violation unless the agency has specific statutory authority to levy a fine in excess of that amount") or Minn. Stat. § 237.462, subd. 1 (2002), ("After a proceeding under section 237.081, the commission may issue an order administratively assessing monetary penalties for knowing and intentional violations of ... (2) any standards, limitations, or conditions established in a commission order pursuant to sections 237.09, 237.121, and 237.16."). Qwest argues that, because Minn.Stat. § 237.462 (2002) does not specify failure to meet service quality benchmarks as one of the reasons for which the MPUC may impose penalties, the MPUC lacks authority to impose penalties for failure to meet

---

5. Qwest does not specify what evidence is needed or omitted for any particular benchmark.

benchmarks. But the statute states explicitly that it is not exclusive: "The imposition of administrative penalties in accordance with this section is in addition to all other remedies available under statutory or common law." Minn.Stat. § 237.642, subd. 9 (2002).

The MPUC has the statutory authority to impose the penalties prescribed in its order.

### b. Evidence

 "[T]he severity of an administrative sanction must reflect the seriousness of the violation." *In re Revocation of Family Child Care License of Burke*, 666 N.W.2d 724, 728 (Minn.App.2003) (reversing revocation of daycare provider's license as overly severe sanction); *see also Haugen*, 278 N.W.2d at 80–81 (affirming district court's reversal of commissioner's revocation of real estate brokers' licenses as overly severe sanction); *Henry Youth Hockey* 511 N.W.2d at 457 (affirming revocation of gambling licenses as appropriately severe sanction); *In re Insurance Licences of Kane*, 473 N.W.2d 869, 877–78 (Minn.App.1991) (reversing loss and revocation of license as overly severe sanction), *review denied* (Minn. 25 Sept. 1991); *In re Minnesota Tipboard Co.*, 453 N.W.2d 567, 569 (Minn.App.1990) (affirming suspension of license to sell bingo equipment as statutorily approved sanction), *review denied* (Minn. 30 May 1999).

 Qwest claims the MPUC order is unreasonable because "[t]here is no link between the penalties and any alleged harm." The MPUC order states that

the [MPUC] has previously concluded that payments are appropriate to give meaningful effect to service quality standards.

. . . .

Qwest recommends adopting the [M]PAP in its entirety whereas [the CLECs recommend] changes to tailor the plan to the purpose of the current docket. In neither case did a party propose increasing the payment schedules. Given that those payments are designed to be in the nature of stipulated damages, the [MPUC] is satisfied that they are not excessive.

Accordingly, the MPUC found that the penalty payments, as mandated in *Burke*, 666 N.W.2d at 728, "reflect the seriousness of the violation." MPUC cites the MPAP as authority for the statement that the payments are designed to be in the nature of stipulated damages. Qwest has already agreed to the MPAP; Qwest cites nothing to support its view that a CLEC must show that harm occurred before a penalty can be imposed on Qwest for failing to meet a benchmark.[6]

Qwest fails to show that the MPUC order is not properly supported by the evidence.

### c. Unlawful Taking

 Finally, Qwest argues that the MPUC order will result in a taking of Qwest's property because Qwest will be required to make payments to the CLECs for missing the benchmarks without any compensation from the CLECs. The MPUC responds that Qwest's claim is, at best, premature: Qwest has not yet been

---

**6.** Qwest claims that "when asked directly by [the MPUC] to point to support in the record for doubling the billing measures penalty cap [from $5,000 to $10,000], the [CLECs] merely argued that doubling the penalty would provide greater incentive for Qwest to reduce billing errors." But the transcript reflects a more involved explanation of why the change was made and sets forth responses to several questions from the commissioners on the topic.

deprived of any property. "[A] takings claim cannot be based on the rate-making methodology, but rather it must be based on the rate itself. . . . It is not enough that a party merely speculates that a government action will cause harm." *Iowa Utils. Bd. v. F.C.C.*, 219 F.3d 744, 754 (8th Cir. 2000) (quotation omitted) (*Iowa Utilities II*).

In its taking claim, Qwest fails to consider that it controls the quality of the service it provides and that its rates can be adjusted if compliance with the MPUC's order deprives it of "a fair and reasonable return." But until Qwest has in fact been deprived of its property, it has no takings claim.

## DECISION

We conclude that neither the MPUC order as a whole nor the penalty payments conflict with state or federal law; that adequate evidence supports the order in general and the penalty payments in particular, and that a claim that the penalty payments are an unlawful taking is premature.

**Affirmed.**

MINGE, Judge (concurring specially).

I join in the opinion of the court and write to express additional views on the authority of the Minnesota Public Utilities Commission (MPUC) to include an enforcement mechanism in its order.

It is well accepted that, although administrative agencies have only the authority granted to them by law, that authority includes the incidental powers necessary to accomplish the duties conferred on them. *See State ex rel. RR & Warehouse Comm'n v. Mees*, 235 Minn. 42, 46, 49 N.W.2d 386, 389 (1951); *cf Lenihan v. Tri–State Telephone & Telegraph Co.*, 208 Minn. 172, 184, 293 N.W. 601, 607 (1940). There is little or no caselaw extending this

principle to the type of sanctions at issue here. *See generally* 2 Am.Jur.2d *Administrative Law* §§ 52–98 (1994). Lacking either a legislative grant of a specific power to sanction or clear caselaw granting that power, the question of an agency's power to sanction is a legal issue of first impression. However, some guidance exists. The larger question of agency discretion to define its mandate in the course of its rulemaking was addressed in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). This landmark case has been cited and analyzed in several settings. *See, e.g.,* Note, *A Pragmatic Approach to* Chevron, 112 Harv. L.Rev. 1723 (1999). Although the power to define enforcement and sanctions is a different area of administrative activity than the rulemaking considered in *Chevron,* our task is analogous.

Here, it is clear that the PUC has pervasive authority to regulate local telephone service. *See* Minn.Stat. § 237.16 (2002). The state and federal governments have also decided that competition in providing local telephone service should be promoted. *See, e.g.,* 47 U.S.C. § 261(c); Minn. Stat. § 237.16. The challenging task of establishing a framework for a competitive market falls partly on the MPUC. The use of scheduled penalties, principally payable to the firms injured by violations of the order, is a creative way to streamline enforcement of the new MPUC rule. The consequences of violations are predictable. The process is simple. In this newly competitive market of local telephone service, such qualities may be important to maintaining the level playing field that the marketplace requires. Although the enforcement mechanism may be new, it is not inherently irrational. By looking at the variety of ways in which an incumbent local exchange carrier (relator Quest in

this case) may fail to meet standards of service, it is innovative. By tying the size of penalty to the benchmark standard which is violated, the penalty is flexible. It is unreasonable to tie the hands of an agency that is attempting to handle its broad responsibilities in a prudent fashion by requiring it to obtain specific legislative authority for each enforcement step it takes in every new setting. I conclude that the MPUC's efforts are a rational approach to fulfilling its mandate and are within the implied authority of the MPUC to meet its responsibilities.

Relator has challenged the sanction on the ground that the size of the penalties is inappropriate. But the size of the penalties is very difficult to evaluate on this record in a pre-enforcement proceeding and would be best determined in an enforcement proceeding.